848 P.2d 1095

**BRAZOS LAND, INC., Plaintiff–Appellant,**

v.

**BOARD OF COUNTY COMMISSION-ERS OF RIO ARRIBA COUNTY, Defendant–Appellee.**

**No. 12340.**

Court of Appeals of New Mexico.

Jan. 28, 1993.

William D. Winter, Jones, Snead, Wertheim, Rodriguez & Wentworth, P.A., Santa Fe, for plaintiff-appellant.

Anita P. Miller, Albuquerque, for defendant-appellee.

## OPINION

CHAVEZ, Judge.

Appellant, Brazos Land, Inc. (Brazos), a subdivider, appeals the decision of the district court of Rio Arriba County which upheld the disapproval of their subdivision plat by appellee, Board of County Commissioners of Rio Arriba County (Board).

Two issues are presented:

1. Whether New Mexico Constitution article IV, section 34 prevented application of a later enacted ordinance to Brazos's subdivision plat;

2. Whether Brazos is entitled to automatic plat approval pursuant to NMSA 1978, Section 47–6–22(C) (Repl.Pamp.1982).

We affirm.

*Facts*

Brazos submitted its application for preliminary plat approval to the Board on June 4, 1985. The subdivision, "Lakes on the Chama," was, at that time, subject to regulations revised and promulgated as of October 8, 1982 (1982 Regulations).

The Board, in considering subdivision applications, is governed by the New Mexico Subdivision Act, NMSA 1978, §§ 47–6–1 to –29 (Repl.Pamp.1982) (the Act). The subdivision type determines which procedures will govern the approval process. Here, the subdivision was designated a type-two subdivision, as it contained ninety-nine lots with a maximum of 2.8 acres. § 47–6–2(M).

On July 8, 1985, the State Engineer's Office rendered an adverse opinion finding that Brazos's water proposals did not conform with county regulations. The relevant statute states that the Board then "shall hold a public hearing devoted solely to determining whether or not the subdivider's water proposals conform with county regulations." § 47–6–11(H)(3). Within thirty days of the hearing, the "[s]ubdivision plats submitted to the board of county commissioners for approval shall be approved or disapproved...." § 47–6–22(B)(3); *see also* § 47–6–14(E). The Board neither held a public hearing nor rendered a decision on Brazos's plat. Instead, on October 5, 1985, the Board enacted a moratorium on all subdivision approvals for which preliminary plat approval had not been received prior to the date the moratorium went into effect. Initially, the moratorium was to run until March 31, 1986, but it was later extended until June 15, 1986, in order to allow the Board time to develop new, more restrictive county subdivision regulations, which addressed the issues of density controls and groundwater contamination.

On April 25, 1986, Brazos notified the Attorney General in writing that the Board had failed to act on its plat. Brazos relied on Section 47–6–22(C) in giving notice. That section provides:

> Except as provided in Subsection G of Section 47–6–11 NMSA 1978, if the board of county commissioners does not act upon the plat within the required period of time, the plat is deemed to be approved thirty days after the subdivider gives the attorney general written notice of the board of county commissioners' failure to act. If the board of county commissioners fails to approve or reject

the final plat within the thirty days after notice to the attorney general, upon demand, the board of county commissioners shall issue a certificate stating that the plat has been approved.

On May 13, 1986, the Board promulgated new subdivision regulations (1986 Regulations), and the moratorium was subsequently lifted on June 15, 1986. A public hearing was held on Brazos's plat application on August 5, 1986. The Board then applied the 1986 Regulations to the plat and subsequently denied plat approval on September 17, 1986.

*Discussion*

*Application of N.M. Const. art. IV, § 34*

Brazos contends that New Mexico Constitution article IV, section 34 requires the Board to apply its 1982 Regulations because they were the regulations that were in effect when Brazos submitted its subdivision application, rather than the amended 1986 Regulations. This section of the constitution provides that "[n]o act of the Legislature shall affect the right or remedy of either party, or change the rules of evidence or procedure, in any pending case."

Brazos contends that the submission of a subdivision plat application constitutes a pending case and therefore invokes article IV, section 34 of the New Mexico Constitution. In support of this contention, Brazos relies on *State ex rel. Edwards v. City of Clovis*, 94 N.M. 136, 607 P.2d 1154 (1980); *Phelps Dodge Corp. v. Revenue Division of the Department of Taxation & Revenue*, 103 N.M. 20, 702 P.2d 10 (Ct.App. 1985); and *Chilili Corp. Ass'n v. Sundance Mountain Ranches, Inc. (In re Sundance Mountain Ranches, Inc.)*, 107 N.M. 192, 754 P.2d 1211 (Ct.App.1988).

■ We find persuasive the reasoning followed by the court in *Sundance Mountain Ranches*, where a county commission had approved a subdivision and adopted new regulations while a district court case over Sundance's right to subdivide was pending. The court applied a vested rights analysis, even though a pending case existed, and declined to retroactively apply the new regulations. The court determined that the property owner had reasonably relied on the county's grant of approval and had incurred extensive obligations in reliance upon the approval. In reaching this decision, the court in *Sundance Mountain Ranches* relied on *El Dorado at Santa Fe, Inc. v. Board of County Comm'rs*, 89 N.M. 313, 551 P.2d 1360 (1976) (governmental body may be estopped to enforce newly adopted regulations to a proposed subdivision, where property owner is shown to have reasonably relied on county's grant of approval and has incurred extensive obligations in reliance thereon); and *Aragon & McCoy v. Albuquerque National Bank*, 99 N.M. 420, 659 P.2d 306 (1983) (property owners generally have no vested rights in a specific zoning classification). The court in *Sundance Mountain Ranches* relied in dicta only on the *Edwards* article IV, section 34 analysis of pending cases.

In other jurisdictions, the determination of whether a new zoning ordinance will be applied retroactively is analyzed under a vested rights approach. 1 Robert M. Anderson, *American Law of Zoning* § 6.06 (3d ed. 1986); *Raley v. California Tahoe Regional Planning Agency*, 68 Cal. App.3d 965, 137 Cal.Rptr. 699 (1977). There are two prongs that must be met for a vested right to exist. First there must be approval by the regulatory body, and second, there must be a substantial change in position in reliance thereon. *Id.* Here, Brazos received no assurance to expect approval and no actual approval of the application. Nor was there any substantial reliance or change in position. Therefore, Brazos had no vested right and is subject to the Board's 1986 Regulations.

■ The definition of "pending" in the context of the purpose behind article IV, section 34 was clearly set forth in the seminal case of *Stockard v. Hamilton*, 25 N.M. 240, 245, 180 P. 294, 295 (1919):

The evident intention of the Constitution is to prevent legislation interference with matters of evidence and procedure in cases that are in the process or course of litigation in the various courts of the state, and which have not been concluded, finished, or determined by a final

judgment. This provision of the Constitution was inserted for the purpose of curing a well-known method, too often used in the days when New Mexico was under a territorial form of government, to win cases in the courts by legislation which changed the rules of evidence and procedure in cases which were then being adjudicated by the various courts of the state.

In light of the purpose of article IV, section 34, which is to prevent legislative interference with adjudication of pending cases, the following language in *Edwards* is unnecessarily broad: "[A] City cannot, by enacting an ordinance, affect or change what would be the result of a pending action before the City Council or Commission or the result of a pending case in court, based upon valid ordinances existing at the time of the application or suit." *Id.*, 94 N.M. at 138, 607 P.2d at 1156. Furthermore, *Edwards* involved a writ of mandamus which was a pending case within the *Stockard* definition because it was in the course of litigation, in the district court, and was not concluded, finished, or determined by a final judgment. Here, there was no litigation, merely an application for preliminary plat approval. Therefore, we are not persuaded that *Edwards* is applicable. *See State v. Scott*, 90 N.M. 256, 561 P.2d 1349 (Ct.App.1977) (court of appeals can, consistently with *Alexander v. Delgado*, 84 N.M. 717, 507 P.2d 778 (1973), consider whether Supreme Court precedent is applicable), *overruled on other grounds*, *State v. Reynolds*, 98 N.M. 527, 650 P.2d 811 (1982).

Brazos also cites *Phelps Dodge Corp.* for the proposition that article IV, section 34 precludes retroactive application of the 1986 Regulations. *Phelps Dodge Corp.* resolved an administrative tax refund proceeding wherein a taxpayer filed a request for a refund of taxes previously paid. The court found the proceeding in *Phelps Dodge Corp.* to fall within the article IV, section 34 definition of "pending case" because (1) the statutorily mandated review process required the plaintiff to first make this formal request for relief from government action to the Director of Bureau of Revenue; and (2) the plaintiff had to exhaust the administrative remedies before invoking the jurisdiction of the district court. *Id.*, 103 N.M. at 23, 702 P.2d at 13. While the taxpayer's request was pending, the legislature enacted a bill which affected the outcome of the taxpayer's request. The administrative proceeding in *Phelps Dodge Corp.* was tantamount to the legislature trying to adjudicate a particular case to directly interfere with the outcome. Therefore, application of article IV, section 34 was consistent with policy underlying the constitutional provision. *See Stockard v. Hamilton.* In the case at hand, no such pending case was created administratively or by filing a legal suit before the moratorium or amended regulations were enacted. The only administrative action Brazos took was to submit a preliminary plat application, which the Board has legal discretion to consider and approve or disapprove. *See El Dorado at Santa Fe, Inc. v. Board of County Comm'rs.*

We hold that the Board's 1986 Regulations are applicable to Brazos. Brazos did not establish a vested right; nor does submission of a preliminary plat application achieve pending status. Moreover, for purposes of determining which regulations apply to a subdivision plat application, we believe that a vested rights analysis is the better reasoned approach rather than further semantic refinement of the meaning of "pending" for purposes of a rigid article IV, section 34 analysis.

*Applicability of Section 47–6–22(C)*

■ Brazos sought relief under Section 47–6–22(C), which is referred to by the parties as a "default provision" in that, should a board fail to act upon a final plat, the statute allows for automatic plat approval. Brazos first argues that the default provision applies because the Board defaulted in its statutory duties. Brazos contends that the Board had to hold a public hearing on the State Engineer's adverse opinion sixty days after they received notice of the opinion. Section 47–6–11(H)(3) states:

> [I]f, within sixty days of the date the subdivider was notified, the state engineer does not change his opinion or issue

a favorable opinion when one has been withheld because of insufficient information, the board of county commissioners shall hold a public hearing devoted solely to determining whether or not the subdivider's water proposals conform with county regulations.

Brazos interprets the statute as giving the Board a maximum of sixty days within which to hold a public hearing. This public hearing should be followed by a final approval or disapproval within the next thirty days pursuant to Section 47–6–14(E). Because the Board did not carry out either of these duties, Brazos contends that they are entitled to automatic plat approval via the default provision.

The Board reads the statute as allowing the State Engineer sixty days to change his opinion, and then mandating that the Board shall hold a public hearing but within no particular timetable. The Board believes that the legislature intentionally left "gaps" in the subdivision review process to allow counties time to evaluate information. We do not agree entirely with the Board's statutory analysis. However, we agree that Brazos's reading is incorrect.

In a 1980 New Mexico Attorney General explanatory guide to New Mexico subdivision law, former Attorney General Jeff Bingaman recognized in his commentary regarding Section 47–6–22 that there was a conflict among jurisdictions whether or not "a time limitation on administrative action commences only when the plat is in final form, or whether it commences when a preliminary or proposed plat is submitted...." *Subdividing Land in New Mexico: A Guide for Subdividers, Land Use Administrators, Public Officials and Land Purchasers* 107 (Att'y Gen.1980). Although the commentary recognized the uncertainty in the law on this point, it did not resolve it. *Id.* However, the legislature amended Section 47–6–22 in 1981, shortly after the guide was published, to include the use of "final subdivision plat" in Section 47–6–22(B)(1), (2). "Final" was not added to Section 47–6–22(B)(3), the subsection that applies to type-two plats such as Brazos's. However, it was not necessary to add the word "final" to this section because it also does not contain the term

"subdivision plat," which is precisely what "final" would be used to modify. Furthermore, the implementation section of the default statute, Section 47–6–22(C), was expressly amended in 1981 to include the limiting phrase "final plat."

Secondly, Brazos had a preliminary plat as defined by the Rio Arriba County, New Mexico Land Subdivision Regulations, article III, section 1 (1982), which defines "Plat Preliminary" as "a map and other submittals as required by these regulations of a proposed land subdivision showing the character and proposed layout of the tract in sufficient detail to indicate the suitability of the proposed subdivision of land." A "Plat Final" is defined in part as "a map of a land subdivision prepared in a form suitable for filing of record with necessary affidavits, dedications and acceptances." *Id.* Rio Arriba's subdivision regulations provide for preliminary approval as a prerequisite to final approval. For preliminary plat approval, the plat must first pass the Planning Commission's review. *Id.*, art. VI, § 2(B)(3). "Approval or conditional approval of a preliminary plat shall not constitute approval of the final plat." *Id.*, § 2(D). As of April 25, 1986, Brazos had neither preliminary nor final plat approval.

In contending that neither a plat's noncompliance with subdivision regulations nor its improper form bar application of the default statute, Brazos suggests that the distinction between "preliminary" and "final" is untenable. We are not persuaded by Brazos's argument. The cases upon which Brazos relies are either memorandum opinions providing scant information regarding the facts or reasoning followed by the courts, or cases involving statutory provisions dissimilar to Section 47–6–22, such as a default statute specifically designed for approval of preliminary plats. *See Fishman v. Arnzen,* 29 A.D.2d 954, 289 N.Y.S.2d 42 (1968); *Wallkill Manor Ltd. v. Coulter,* 40 A.D.2d 828, 337 N.Y.S.2d 366 (1972), *aff'd,* 33 N.Y.2d 783, 350 N.Y.S.2d 416, 305 N.E.2d 494 (1973); *State ex rel. Lozoff v. Board of Trustees,* 55 Wis.2d 64, 197 N.W.2d 798 (1972). We do, however, acknowledge that the general purpose behind default statutes is to en-

sure that planning boards do not deny property owners their rights by mere inaction. Emmett C. Yokley, *Law of Subdivision* § 55 (2d ed. 1981). Furthermore, some jurisdictions reject the distinction between preliminary and final plats precisely because such a distinction is seen as contravening the legislative intent behind default statutes, which is to set a certain number of days for final action. *See, e.g., P.H. English, Inc. v. Koster*, 61 Ohio St.2d 17, 399 N.E.2d 72 (1980).

In construing Section 47–6–22, we believe that the 1981 amendment adding the phrase "final plat" supports the distinction between preliminary and final plats for purposes of application of our default statute. We are persuaded by the reasoning in *Mahopac Isle, Inc. v. Agar*, 39 Misc.2d 1, 239 N.Y.S.2d 614 (Sup.Ct.1963), which interpreted its default statute as applying only to final plats and not preliminary ones because " '[n]o Court should construe a default statute in such a manner as to penalize the future and orderly growth of a community unless there is no other construction open.' " *Id.* 239 N.Y.S.2d at 617 (quoting *In re A.E. Ottaviano, Inc.*, 33 Misc.2d 263, 224 N.Y.S.2d 487, 490 (Sup.Ct. 1961)). We hold that Section 47–6–22(C) applies only to final plats. Therefore, since the remedy sought by Brazos under Section 47–6–22(C) applies to a board's rejection or approval of a final plat, it is not available to Brazos.

■ On the merits of Brazos's statutory construction and the Board's objections, we tend to think the legislature intended to set a sixty-day period within which the State Engineer might change his opinion or issue a favorable one when one has been withheld for insufficient information and that a public hearing by the Board is mandatory if the State Engineer does neither. However, the language of the statute is not perfectly clear, and the legislature's intent is thus not obvious. We do not think the Board is required to hold a hearing within a designated period of time, but we assume that, in the absence of an expressly-designated period of time, the Board should act within a reasonable period of time.

■ In this case, we assume but need not decide that a fifteen-month gap would have been unreasonable, absent the moratorium. If the moratorium that was in effect when Brazos gave the Attorney General its notice was a valid exercise of the Board's powers, however, the record supports a conclusion that the Board acted within a reasonable time. The district court held that the moratorium was a valid exercise of "the County's implied planning, zoning and subdivision powers as well as its police powers." We agree.

Brazos contends that the Board's moratorium on subdivision approval was illegal and without statutory authority. We are not persuaded by Brazos's argument. The cases upon which Brazos relies can be distinguished from the case at hand. In *Harlow v. Planning & Zoning Commission of the Town of Westport*, 194 Conn. 187, 479 A.2d 808 (1984), the moratorium by its own terms only applied to future applications; therefore, the court noted that, had the commission wanted to include pending applications, it would have been simple enough for it to have stated those terms expressly. *Id.* 479 A.2d at 812. Furthermore, the same court, on the same day, involving the same moratorium, found that the moratorium was a valid exercise of implied power. *Arnold Bernhard & Co. v. Planning & Zoning Comm'n*, 194 Conn. 152, 479 A.2d 801 (1984). The factors the court considered in finding the moratorium valid are also present in the moratorium at hand: the terms were limited in time and scope and were not substantively unreasonable. *See id.* In *Board of Supervisors v. Horne*, 216 Va. 113, 215 S.E.2d 453 (1975), the moratorium was invalid because there was no express statutory language regarding authority to pass interim legislation, and there was also no necessity behind this particular ordinance. Failure to comply with statutory notice requirements in enacting ordinances was another reason given for failure to uphold certain moratoriums. *City of Gainesville v. GNV Investments, Inc.*, 413 So.2d 770 (Fla.Dist.Ct. App.1982). Finally, Brazos's reliance on *Norco Construction, Inc. v. King County*, 97 Wash.2d 680, 649 P.2d 103 (1982) (en banc), is also misplaced, because the reason the court applied the default statute to the

preliminary plat application was precisely because the county had failed to enact an interim zoning ordinance that would have been within its general welfare power.

The New Mexico State Legislature has conferred police powers to counties through NMSA 1978, Section 4–37–1 (Repl.Pamp.1992), which states that:

> [C]ounties are granted the same powers that are granted municipalities.... Included in this grant of powers ... are those powers necessary and proper to provide for the safety, preserve the health, promote the prosperity and improve the morals, order, comfort and convenience of any county or its inhabitants. The board of county commissioners may make and publish any ordinance to discharge these powers not inconsistent with statutory or constitutional limitations placed on counties.

The Board is given express and implied authority by the legislature to regulate subdivisions within its boundaries. These regulations require water of an acceptable quality for subdivision use, solid and liquid waste disposal, and "any other matter relating to subdivisions which the board of county commissioners feels is necessary to insure that development is well planned." § 47–6–9(A)(11).

Restrictions upon the use of one's property are imposed by state and local governments pursuant to police power. The United States Supreme Court has long held that governments may, pursuant to police power, adopt zoning ordinances that regulate the manner in which real property may be used. *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). "When used to promote the public interest, [zoning] is justified and has been upheld as a legitimate exercise of the police power." *Miller v. City of Albuquerque,* 89 N.M. 503, 505, 554 P.2d 665, 667 (1976); *City of Santa Fe v. Gamble–Skogmo, Inc.,* 73 N.M. 410, 389 P.2d 13 (1964).

Where the Board enacted a moratorium for the purpose of, inter alia, promulgating more stringent waste disposal requirements for subdivisions, and where such requirements and restrictions reasonably advanced a legitimate state interest in the safety and health of the inhabitants of Rio Arriba County, we hold that the Board's moratorium was a valid exercise of its police power and its express and implied authority. *See Abraham v. City of Mandeville,* 638 F.Supp. 1108 (E.D.La.1986) (city council's moratorium on issuance of building permits was a fair exercise of its police power), *aff'd,* 814 F.2d 657 (5th Cir.1987); *see also Sun Ridge Dev., Inc. v. City of Cheyenne,* 787 P.2d 583 (Wyo.1990) (moratorium on building permits was a reasonable response to drainage problems and city's use of a moratorium was a valid exercise of its police power).

*Conclusion*

We affirm the district court's finding that the Board did not act arbitrarily, capriciously, in abuse of its discretion, or otherwise not in accordance with law.

IT IS SO ORDERED.

MINZNER, C.J., and PICKARD, J., concur.